[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 02, 2002
THOMAS K. KAHN
CLERK

————————————

No. 01-14587

————————————

D.C. Docket No. 94-02501 CV-MHS-1

SIERRA CLUB,
GEORGIA ENVIRONMENTAL
ORGANIZATION, INC.,
COOSA RIVER BASIN INITIATIVE
INC.,
TROUT UNLIMITED,
OGEECHEE RIVER VALLEY
ASSOCIATION, INC.,

Plaintiffs-Appellees,

versus

A. STANLEY MEIBURG, Acting Regional
Administrator,
CHRISTINE T. WHITMAN,
Administrator, the United States Environmental
Protection Agency,
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY ("U.S. EPA"),

Defendants-Appellants.

———————————————————

Appeal from the United States District Court for the
Northern District of Georgia

———————————————————

**(July 2, 2002)**

Before EDMONDSON, Chief Judge, CARNES and SILER[*], Circuit Judges.


CARNES, Circuit Judge:

The order we have before us in this appeal is based upon either an

interpretation of a consent decree or a modification of the decree. Which one of

the two the order is determines whether we have jurisdiction to review it. If the

order is a modification of the decree, instead of merely an interpretation, we have

appellate jurisdiction and the issue we must then decide is whether the district

court abused its discretion by modifying the decree as it did.

The consent decree itself resulted from a lawsuit brought by Sierra Club,

along with a collection of state and local environmental organizations, against

EPA.[1] The plaintiff environmental groups (for convenience we will refer to them

collectively as Sierra Club), had sued EPA to force it to establish and implement

pollution standards for Georgia waterways. The consent decree that was eventually

———————————————————

[*]Eugene E. Siler, Jr., U.S. Circuit Judge, for the Sixth Circuit, sitting by designation.

[1] Those organizations include the Ogeechee River Valley Association, Trout Unlimited, Georgia Environmental Organization, and the Coosa River Basin Initiative.

entered set out a timetable for the establishment of those standards. EPA did establish the standards.

A couple of years after the consent decree had been entered, none of the pollution standards EPA established as a result of the decree had actually been implemented. Upset with the lack of progress, Sierra Club moved the district court to reopen the consent decree and to take action compelling EPA to develop implementation plans for the standards. EPA took the position that the State of Georgia had the primary responsibility for implementing the standards EPA had established. The district court deferred ruling on Sierra Club's motion pending Georgia's development of the implementation plans. Once Georgia filed with the court what it asserted were the required plans, EPA moved to have Sierra Club's motion to re-open and compel declared moot. Sierra Club responded that Georgia's implementation plans were not adequate and insisted that EPA had the responsibility under the decree for formulating them. The district court denied EPA's mootness motion because it agreed with Sierra Club that the consent decree required EPA to develop implementation plans or to ensure that those Georgia developed were adequate to satisfy the Clean Water Act.

EPA has appealed the district court's order refusing to dismiss as moot Sierra Club's motion to re-open and compel, contending that the court's decision to

3

impose on it an implementation-plan requirement modified the decree, and that the modification was an abuse of the district court's discretion. Sierra Club takes the position that the district court, when it stated EPA was required to develop implementation plans, was not modifying but merely interpreting the consent decree. If that is so, we lack jurisdiction over this appeal, because the only possible jurisdictional basis for it is 28 U.S.C. § 1292(a)(1) which authorizes us to review interlocutorily an order modifying an injunction. Sierra Club also argues in the alternative that, even if the district's interpretation of the decree crossed the line into modification, thereby giving us jurisdiction to review it, we should hold that in view of changed circumstances the modification was not an abuse of discretion.

Our reading of the consent decree convinces us it did not require EPA to develop an implementation plan for the water quality standards it was to set, and the clarity of the decree on the point is sufficient that the district court's later imposition of such a requirement constitutes a modification of the decree. As a result, we have jurisdiction to review the district court's action, and we conclude that the court abused its discretion by grafting onto the decree a substantial modification that was not part of the original bargain between the parties.

## I. BACKGROUND

4

The dispute about the terms of the consent decree plays out against the background of the statutory and regulatory scheme established by the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, so we will start with that scheme. Congress passed the Clean Water Act (the "Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that goal, the Act gives EPA two main roles and responsibilities. The first is issuing permits that govern individual discharges of pollutants, and the second is setting global water quality standards for particular bodies of water.

**Permits and Point Sources**

Section 301(a) of the Act prohibits the discharge of any pollutants except those that are sanctioned by a permit. 33 U.S.C. § 1311(a). The statute gives EPA the authority to issue permits for point sources, and those permits are to establish technology-based effluent limitations that incorporate increasingly stringent levels of pollution control technology over time. 33 U.S.C. §§ 1311(b)(1)(A), (B), (b)(2). The limits set out in the permits are to be based on how low current technology can push pollution levels, and those limits are to be lowered as pollution-reducing technology improves. Permits are issued to individual dischargers through the National Pollutant Discharge Elimination System (NPDES) program. Id. at § 1342.

Like most states, Georgia administers the NPDES program within its borders subject to EPA oversight of the states's permit-issuing procedures.[1]

Permits cannot control all sources of pollution. They are aimed only at pollution coming from a "point source," which is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged," that offers a particular 'point' to measure the amount of pollution being discharged. 33 U.S.C. § 1362(14).

## Non-Point Sources, Water Quality Standards, and TMDLs

In addition to originating from point sources, pollution also comes from non-point sources, such as runoff from farmlands, mining activity, housing construction projects, roads, and so on. Non-point sources cannot be regulated by permits because there is no way to trace the pollution to a particular point, measure it, and then set an acceptable level for that point. Therefore, to regulate non-point pollution, the Act requires states to establish water quality standards. 33 U.S.C. §§ 1313(a)-(c). To determine the water quality standard, a state designates the use for which a given body of water is to be protected (fishing, for example), and then determines the level of water quality needed to safely allow that use. Id. at §

---

[1]Like Georgia, most states –44 of them– are in charge of their own NPDES progam. In the other six states EPA runs the program.

1313(c)(2)(A). That level becomes the water quality standard for that body of water.

Things can get complicated. Because of non-point source pollution, achieving the specified water quality standard in a body of water may require more stringent limitations upon point-source discharges than would otherwise be required under the permit-issuing regime we have previously described. If the regulation of point-source discharges does not achieve the necessary level of water quality, Total Maximum Daily Loads (TMDLs) come into play. Id. at § 1313(d)(1)(A), (C). A TMDL is a specification of the maximum amount of a particular pollutant that can pass through a waterbody each day without water quality standards being violated. Id. at § 1313(d)(1)(C).

TMDLs must be established for every waterbody within the state for which ordinary technology-based point-source limits will not do enough to achieve the necessary level of water quality. Id. at §§ 1313(d)(1)(A), (C). The state must compile a list of these bodies of water in a report and submit it to EPA for approval. Id. at §§ 1313(d)(1)(A), (d)(2). (This list is sometimes referred to as "the 303(d) list," because that is the section of the Act which requires each state to prepare the list.) Each body of water on the list is known as a "water quality limited segment" (or "limited segment" for short), see 40 C.F.R. § 130.2(j), and

7

the state must set a TMDL for every pollutant in each limited segment.[2] 33 U.S.C. § 1313(d)(1)(C).

Each TMDL serves as the goal for the level of that pollutant in the waterbody to which that TMDL applies, allocating the total "load" – the amount of pollutant introduced into the water, see 40 C.F.R. § 130.2(e) – specified in that TMDL among contributing point and non-point sources. The theory is that individual-discharge permits will be adjusted and other measures taken so that the sum of that pollutant in the waterbody is reduced to the level specified by the TMDL. As should be apparent, TMDLs are central to the Clean Water Act's water-quality scheme because, as one of the plaintiffs puts it, they tie "together point-source and nonpoint-source pollution issues in a manner that addresses the whole health of the water." Brief of Appellee Ogeechee River Valley Association at 14.

The states are primarily responsible for preparing lists of limited segments and their corresponding TMDLs, see 33 U.S.C. §§ 1313(d)(1)(A), (C), but EPA has approval authority over those lists. Id. at § 1313(d)(2). If EPA disapproves a state's list of limited segments, or a TMDL, EPA must issue its own list or TMDL.

_____

[2]A limited segment is often referred to as a "WQLS," but given the number of other acronyms in our discussion we will avoid that one.

8

Id. Some courts have held that a state's failure to timely submit its TMDLs can be taken under certain circumstances by EPA as a constructive submission of no TMDLs, triggering EPA's responsibility to establish its own. See Scott v. City of Hammond, 741 F.2d 992, 996-98 (7th Cir. 1984); Kingman Park Civic Ass'n v. EPA, 84 F. Supp. 2d 1, 5 (D.D.C. 1999) (holding that "[l]ike the majority of courts that have confronted this quandry, this Court holds that 'if a state fails over a long period of time to submit proposed TMDL's, this prolonged failure may amount to constructive submission by that state of no TMDL's'" (omitted citation)). We have not addressed this issue of constructive submission yet, and need not do so in this case because under the consent decree EPA was obligated to issue its own TMDLs according to a prescribed timetable if Georgia continued to fail to establish them.

Once established, TMDLs are implemented through various mechanisms, some of which are provided in the Act, with responsibilities for implementation divided between EPA and the states. Point-source discharges are regulated through the federal permit regime, with TMDLs incorporated into the effluent and technological-based limitations. 40 C.F.R. § 122.44(d)(1)(vii)(B). Although EPA has the authority to issue permits, it has delegated that authority to the states, at least to the majority of them, including Georgia. Even where it has delegated that

9

basic authority, however, EPA does retain the right to include additional limits in NPDES permits when necessary to ensure a congressionally-established standard of water quality. 33 U.S.C. §§ 1312(a), 1342(a).

The Act generally leaves regulation of non-point source discharges through the implementation of TMDLs to the states. 33 U.S.C. §1329. It imposes on the states planning responsibilities, including the preparation of a non-point source management plan, commonly referred to as a § 319 report. Id. at § 1329(a). In this report, a state must, among other things, identify waters where water quality standards can reasonably be met only by additional action to control non-point source pollution, and designate the categories and subcategories of non-point sources that contribute to the pollution in those waters. Id. at § 1329(a)(1). States also have to prepare a management program that identifies "best management practices and measures" to reduce pollution. Id. at § 1329(b). EPA exercises authority over these programs and must approve them. Once the programs have been approved, EPA may make grants to the states to allow them to implement the plans. Id. at § 1329(h).

Finally, a state has to prepare a "continuing planning process," which is essentially a plan for how the state is going to clean up pollution. Id. at § 1313(e)(1). Like the best management program, EPA has to approve or disapprove

each state's continuing planning process and, once it has been approved, occasionally review it to ensure it stays consistent with the Act. Id. at §1313(e)(2). In preparing its continuing planning process, a state must incorporate established TMDLs, see id. at § 1313(e)(3)(C).

To summarize, under the Clean Water Act, Georgia has the primary authority and responsibility for issuing permits and controlling nonpoint source pollution in that state. It also has both the authority and the duty to compile the list of limited segments (the § 303(d) list), and establish TMDLs for each waterbody on the list. EPA, for its part, has supervisory authority over various reports and plans which the state is required by the Act to produce. EPA can also compile its own list of limited segments and establish its own TMDLs, if the state's efforts are either inadequate or too long delayed.

**The Consent Decree and Dispute in this Appeal**

By the time Sierra Club sued EPA in 1994, sixteen years after the Act had gone into effect, Georgia had established only two TMDLs for the approximately 340 limited segments identified in its 303(d) list, and the district court found that neither of those two TMDLs satisfied the requirements of the Act. In the lawsuit, Sierra Club asked the court to force EPA to establish the TMDLs and to implement them, because Georgia had not done so. The district court granted summary

11

judgment for Sierra Club, Sierra Club v. Hankinson, 939 F.Supp. 865 (N.D. Ga. 1996), and entered an injunction requiring the EPA to both establish and implement TMDLs for all Georgia limited segments by June 2001. Sierra Club v. Hankinson, 939 F. Supp. 872 (N.D. Ga. 1996). The injunction directed EPA to "implement (or ensure that the State implements)" TMDLs through the modification, revocation, and re-issuance of permits. It also imposed a number of other requirements on EPA, most of which had to do with making it exercise supervision over Georgia's water quality control efforts. EPA appealed to this Court.

While EPA's appeal was still pending, in July of 1997 the parties agreed upon the terms of a consent decree and persuaded the district court to enter it, which it did in October of 1997. In the consent decree, EPA was ordered to establish TMDLs for the limited segments on Georgia's § 303(d) list on a basin approach if Georgia continued to fail to do so. Under a schedule set out in the decree, all TMDLs were to be established by 2004, and additional, more specific deadlines were included. The decree provided that by 1998, EPA was to establish TMDLs for twenty percent of the waterways on Georgia's 1996 list of limited segments. These 1998 TMDLs are the ones that are the subject of this appeal, the ones Sierra Club says EPA should have prepared an implementation plan for, but

12

they are only the first group of TMDLs that EPA was to establish under the terms of the  consent decree.  The decree also required the EPA  to establish TMDLs for the remaining waterbodies on a river basin rotation schedule, if Georgia failed to do so.

The basin rotation schedule was to begin in 1999, with TMDLs proposed for all the basins by 2004.[3]  Besides establishing TMDLs, the decree imposed other responsibilities on EPA, including: (1) review of Georgia's continuing planning process, (2) proposal of specific terms for Georgia/EPA Performance Partnership Agreements, (3) biennial review of Georgia's TDML program,  and (4) submission of annual compliance reports to the court and to the plaintiff groups.

EPA proposed 124 TMDLs for Georgia's waterbodies in August of 1997 and attached them to the consent decree which the parties submitted to the district court for its approval.  Under the terms of the decree,  those TMDLs were to be "established, or finalized" within six months after being proposed.  All but eight were timely established by EPA, and even those eight were established after Sierra Club filed a motion to force EPA to do so.  Once EPA had established the TMDLs, nothing else was done with them.  Georgia did not incorporate the TMDLs into any

---

[3]EPA's performance in establishing the TMDLs for some of the water basins has been the subject of other litigation under the consent decree, which has resulted in another  decree further defining EPA's duties.

13

of its non-point source management plans or reports and did not implement them. As a result, two years after entering into the consent decree, only one of the 124 waterbodies on Georgia's 1996 § 303(d) list met water quality standards.

Dissatisfied with the progress made towards clean water in Georgia and with EPA action or lack of it, in February 2000 Sierra Club moved the district court to re-open the decree and to compel EPA to take further action. Specifically, Sierra Club moved the court to order EPA to prepare implementation plans for the 124 TMDLs the agency had established in 1998.[4] EPA argued in response that the decree did not obligate it to prepare implementation plans for or to implement TMDLs, and that the decree should not be modified to impose that responsibility on it.

The district court deferred ruling on Sierra Club's motion because Georgia promised to develop implementation plans for the 124 TMDLs within nine months. Within that time period, Georgia did develop implementation plans for all 124 of those TMDLs. Because the plans which Sierra Club wanted EPA to develop had now been developed by Georgia, EPA moved the court to dismiss as moot Sierra Club's motion to re-open and compel. Sierra Club argued that its motion was not

---

[4]Sierra Club moved for other relief as well, but the request that EPA be required to establish implementation plans is the only one involved in this appeal.

moot, because Georgia's implementation plans were flawed or otherwise unsatisfactory.

The district court denied the EPA's motion to dismiss as moot Sierra Club's motion. In its order, the court ruled that "TMDL implementation plans are required [of EPA] by the Consent Decree." As for the Georgia-prepared plans, the court ruled that EPA had "obligations" to "ensure" those plans were adequate. The order did not, however, declare the Georgia plans insufficient. Instead, it directed EPA and Sierra Club to confer about those plans and attempt to reach an agreement concerning them. If their disagreements could not be resolved by discussion, the order stated, the court would grant either party's request for an evidentiary hearing on the sufficiency of the Georgia plans.

EPA appealed the district court's order and also filed an emergency motion for stay pending appeal. In response to a jurisdictional question we issued to the parties, Sierra Club contends that we lack jurisdiction because the district court's order denying EPA's motion to dismiss on mootness grounds is not final so as to be appealable under 28 U.S.C. § 1291, is not appealable under the collateral order doctrine, and is not a modification of an injunction appealable under 28 U.S.C.§ 1292(a)(1). Sierra Club also filed a motion to dismiss for lack of jurisdiction on

those grounds.  EPA responded that this Court does have jurisdiction and, alternatively, petitioned for a writ of mandamus.

## II. DISCUSSION

### A.  Jurisdiction – the District Court Did Modify the Consent Decree

EPA contends that we have jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1), which gives appellate courts jurisdiction to review  interlocutory orders of district courts "granting, continuing, [and] modifying" injunctions.[5] Sierra Club contends that we do not, because the district court did not modify the injunctive relief provided for by the consent decree, but only interpreted the decree.[6]  If Sierra Club is correct and the district court only interpreted the decree, we do not have jurisdiction.  See Birmingham Fire Fighters Ass'n 117 v. Jefferson County, 280 F.3d 1289, 1292 (11th Cir. 2002).

We have said that in order to decide whether a district court's order relating to a prior decree falls within the grant of appellate jurisdiction under § 1292(a)(1),

_____

[5]The parties agree that the district court's order denying EPA's motion to dismiss Sierra Club's motion to enforce or modify the consent decree is not a final order as that term is used in 28 U.S.C. § 1291, and that  the order does not fall within the collateral order doctrine.  We concur with them on those points. Accordingly, whether we have jurisdiction turns on 28 U.S.C. § 1292(a)(1).

[6]The plaintiffs also contend that we lack jurisdiction on the ground that there is no justiciable controversy, because the issue is not yet ripe.  The district court's interpretation of the decree imposed on EPA a requirement to prepare implementation plans or ensure that the ones prepared by Georgia satisfy the requirements of the Act. It ordered EPA to take action within 30 days, action that EPA insists it has no obligation to undertake.  The matter is sufficiently ripe.

we must decide whether the order modified the decree in a "jurisdictionally significant way." Id. at 1292. A district court's interpretation of a consent decree operates as a modification when it changes the legal relationship among the parties. Id. at 1293. This determination is not significantly affected by whether the district court called its order an interpretation, as this district court did, or a modification. See Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1539 (11th Cir. 1986) ("What matters, however, is not the district court's characterization of its order as amendatory or explanatory, but rather the actual effect of the order on the obligations of the parties as set forth in the original judgment.").

If the district court's order changes the legal relationship of the parties, it is a modification of the decree, regardless of what it was called. As we explained in Birmingham Fire Fighters, we do not engage in a fine point analysis of the original decree and the later order. Instead, we take a fairly loose focus and ask whether the district court's reading of the consent decree is "a gross misinterpretation of the decree's original command," one that "leaps from the page." Birmingham Fire Fighters, 280 F.3d at 1293. If so, then we have jurisdiction. Applying this test, our starting point is to determine the legal relationship among the parties that the consent decree itself established. The next step is to determine whether the district

17

court's order changed that relationship in a "jurisdictionally significant way." Id. at 1292.

As this Court has explained before, "As a general matter, the rules we use to interpret a consent decree are the same ones we use to interpret a contract – since a consent decree is a form of contract." Reynolds v. Roberts, 202 F.3d 1303, 1312 (11th Cir. 2000). With a consent decree as with a contract, the first place we look and often the last as well is to the document itself. The consent decree in this case provided that if Georgia failed to establish TMDLs, EPA was required to do so.[7] The decree defined a TMDL as having "the meaning provided at Section 303(d)(1)(C) of the CWA, 33 U.S.C. § 1313(d)(1)(C), and 40 C.F.R. § 130.2(i), as codified as of the Effective Date of this Decree, or as subsequently amended." Neither the referenced statutory provision nor the referenced regulation includes implementation plans within the meaning of TMDLs.[8] The two are different, and

---

[7]EPA agreed to establish the 1998 TMDLs, the ones that are the subject of this appeal, without waiting on Georgia to fail to do so first. In July of 1997 the parties had agreed to the terms of the consent decree, one of which was that in August EPA would propose for public comment by August of 1997 TMDLs for twenty percent of the waterbodies in Georgia's 1996 303(d) list. These TMDLs were attached to the consent decree when the parties submitted the decree to the district court for its approval. The remaining TMDLs were to be developed by EPA only after Georgia failed to do so.

[8]The statutory provision says:

Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for

18

the statute and regulation incorporated into the definition part of the consent decree reflect that difference. A TMDL is defined to be a set measure or prescribed maximum quantity of a particular pollutant in a given waterbody, see 40 C.F.R. § 130.2(i), while an implementation plan is a formal statement of how the level of that pollutant can and will be brought down to or kept under the TMDL.[9]

The consent decree clearly and explicitly places a number of duties on EPA, including the requirement to establish TMDLs on a basin approach if Georgia fails to do so, but it just as clearly does not require EPA to develop implementation plans for those TMDLs once they are established. The decree contains seven pages

_____

such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards.... 33 U.S.C. § 1313.

The regulation defines a TMDL as: "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for non-point sources and natural background." 40 C.F.R. § 130.2(i).

[9]Sierra Club attempts to escape this clear distinction between TMDLs and implementation plans for them by arguing that implementation plans should be read into TMDLs based upon EPA guidance documents and also a proposed rule that was withdrawn before it went into effect. Putting aside any questions about whether those documents actually do define implementation plans into TMDLs, the inescapable fact is that the consent decree does not, because the decree does not define TMDLs by reference to any guidance documents or aborted rule. Instead, the decree defines the term by reference to a specific statutory provision and a specific regulation that is in effect, and neither of those two definitional sources indicates or even implies that TMDLs include implementation plans. We find no ambiguity on the point in either the statute or regulation, and because they are the sole source of the definition of TMDLs in the consent decree they are all we look at to define the term. Cf. Babbit v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 697 n.10, 115 S. Ct. 2407, 2413 (1995) (refusing to apply the ordinary common-law meaning of a term when it was defined in the statute). Given the clarity of the consent decree, we also decline Sierra Club's invitations to consider any extrinsic evidence on the issue.

19

setting out in detail EPA's obligations under it, and conspicuously absent from the list of those obligations is any mention of implementation plans. Indeed, implementation plans are not mentioned at all anywhere in the 28-page decree. If the parties had intended for the decree to put such an important and substantial responsibility on EPA, they would have spelled that out just they spelled out its responsibility to establish TMDLs.

The district court gave two reasons for finding that implementation plans were required by the consent decree. First, it said that "[u]nder EPA's interpretation of the Consent Decree, TMDLs would be developed with no guarantee that they would ever be implemented. Developing TMDLs without implementing them amounts to an academic endeavor which would have no effect on water quality in Georgia." Or, as Sierra Club restates that concern, unless implementation plans are read into TMDLs, the decree is reduced to "empty formalism." We doubt that, because TMDLs are a necessary step before any implementation plans can be formulated. Interpreting the decree as written gives it meaning, because establishing TMDLs is a meaningful and not necessarily simple step in the process of controlling pollution in Georgia's waterbodies. After all, in sixteen years Georgia had established only two of the hundreds of TMDLs that were necessary, and the adequacy of those two was questionable. The decree put

20

the TMDL task with all of its difficulties on EPA. The responsibility for implementing the TMDLs once they were established was left to Georgia, as it is in the Clean Water Act itself.

The second reason the district court gave for its conclusion that EPA was required by the consent decree to establish implementation plans is that reading that into the decree would further the goal of the Clean Water Act, which is cleaner water. The court stated, "EPA's interpretation is incompatible with the Clean Water Act goal of improving water quality. Specifically, among the stated objectives of the Clean Water Act is the following: '[I]t is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner. . . .'". Of course, the national policy and objectives relating to clean water are most reliably embodied in the Act itself which puts the responsibility for implementation of TMDLs on the states. Logically, the Act cannot be a source of authority for changing the Act's allocation of responsibilities. Besides, the district court's approach disregards the Supreme Court's instruction that "any command of a consent decree or order must be found within its four corners, and not by reference to any purposes of the parties or of the underlying statutes." United States v. ITT Continental Baking Co., 420 U.S. 223, 233, 95 S. Ct. 926, 933 (1975) (quotations and citations omitted); see also United

States v. Atlantic Refining Co., 360 U.S. 19, 23, 79 S. Ct. 944, 946 (1959)

(rejecting a loose interpretation of the consent decree even though such an

interpretation might better effectuate the purposes of the acts assertedly violated);

Hughes v. United States, 342 U.S. 353, 356-57, 72 S. Ct. 306, 308 (1952)

(rejecting an invitation to advance the asserted purpose of the consent decree

through an interpretation of a consent decree not justified by the four corners of the

decree).

The Supreme Court has observed that consent decrees generally do not have

overarching purposes which can be used as guides to interpretation.[10]  For example,

in  United States v. Armour & Co., 402 U.S. 673, 682, 91 S. Ct. 1752, 1757

(1971), the Court explained that because consent decrees are normally

compromises between parties with opposing positions in which each party gives up

---

[10]While consent decrees should not be interpreted according to a broad, nebulous purpose, in different contexts courts are called upon to decipher the  purpose of some consent decrees. For example, the Supreme Court has said that when considering whether an institutional-reform decree or other similar decree should be modified, courts are to determine whether the motion is to modify a term of the decree that is central to the basic purpose of the decree.  If it is, then modification is probably not appropriate. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 387, 112 S. Ct. 748, 762 (1992) ("If modification of one term of a consent decree defeats the purpose of the decree, obviously modification would be all but impossible.").  See United States v. City of Miami, 2 F.3d 1497,  1504 (11th Cir. 1993) ("Thus, a court faced with a motion to modify a consent decree in institutional reform litigation must begin by determining the 'basic purpose' of the decree.").  But the purpose of the decree even in that context is not to be conceived at too high a level of generality, and is not used as a basis to expansively interpret the terms of the decree.  In the case before us, the district court used what is considered to be the purpose of the decree  to interpret expansively the decree's terms.  That should not be done.

22

their rights to litigation and to prove their position, consent decrees should be interpreted as written, "and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."  In this case, the parties negotiated the terms of the decree and the timetable for TMDL establishment and other relief within the framework of the statutory scheme set out in the Act.  The decree cannot be interpreted as requiring whatever might be necessary and appropriate to achieve cleaner water, because it was not written that way. It was written to bring about in a more expeditious and certain manner than would otherwise have occurred one important step in the process, and it appears to have achieved that goal or to have nearly done so.

This, then is the original relationship between the parties as established by the consent decree: at Sierra Club's insistence EPA was obligated  to develop for the State of Georgia TMDLs, as defined by the statutory and regulatory provisions.  The order we have before us declared that the consent decree went beyond that and required EPA to develop not just TMDLs  but implementation plans for TMDLs.  Because the decree as written and entered did not require EPA to prepare implementation plans for the TMDLs, the district court's order requiring EPA to prepare them modified the decree because it changed the legal relationship of the parties by "chang[ing] the command of the earlier injunction."  Birmingham Fire

23

Fighters, 280 F.3d at 1293 (internal quotations omitted). If a party obtains a decree forcing another party to perform task A, and a later order adds task B, the legal relationship between the parties has been changed by the later order. That is what happened in this case. There was a change in EPA's obligations, in the tasks with which it was saddled. The law is that if the change is sufficiently obvious – if the original decree did not even arguably require the additional task or obligation, so that the district court's interpretation of the decree is "blatantly or obviously wrong" – then we have jurisdiction to review the order. Id. For the reasons we have set out, we conclude that this is not a close call; the error in the district court's interpretation of the consent decree is obvious enough to give us jurisdiction to review the resulting modification.

## B. The District Court Abused Its Discretion In Modifying the Consent Decree

Having decided that the district court obviously modified the decree when it required EPA to prepare implementation plans, which gives us jurisdiction to review its action, we turn now to the merits issue, which is whether the modification was an abuse of discretion. Sierra Club contends that the modification was within the district court's discretion and points to several

24

provisions in the decree which it says gives the district court the power to modify it.  One of those provisions says that the court retains jurisdiction over the action and may issue orders to modify the terms of the decree and grant further relief as justice requires.  The other says that nothing in the decree "shall be construed to limit the equitable powers of the Court to modify those terms upon a showing of good cause by any party."  We do not read these boilerplate  provisions as giving the district court any more power to modify the decree than it already had under Rule 60(b)(5) of the Federal Rules of Civil Procedure,[11]  as explicated by the Supreme Court in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S. Ct. 748 (1992). The provisions confirm the court's authority to modify the decree, but that authority is still subject to the constraints set out in the Rufo decision.  In that decision the Supreme said that the party seeking modification of a consent decree must show, first, "a significant change either in factual conditions or in law," id. at 384, 112 S. Ct. at 760, and, second, that "the proposed modification is suitably tailored to the changed circumstance." Id.  at 391, 112 S. Ct. at 763.

Sierra Club contends that there have been changes in both the law and surrounding circumstances which justify the district court's modification of the

---

[11]Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application."  Fed. R. Civ. P. 60(b)(5).

25

decree. It points to some guidance documents and a proposed rule published by EPA as proof that the law has changed, but none of those documents or proposals have the effect of law. As for guidance documents, they can modify neither statutes nor regulations. To legally change its regulations, EPA must comply with the rulemaking procedures set out in the Administrative Procedures Act. 5 U.S.C. §§ 551-706. The method by which guidance documents are created does not even come close to compliance with those procedures.

As for the proposed rule Sierra relies upon, it did not work a change in the law because it has never been implemented and in fact has been withdrawn. EPA proposed the new rule in 1999, see 64 Fed. Reg. 46012 (Aug. 23, 1999), and published it as a final rule in July of 2000, see 65 Fed. Reg. 43586 (July 13, 2000), but it was never implemented. Congress refused to appropriate the necessary funds for implementation, which delayed things, see Pub. L. No. 106-246, 114 Stat. 511, 567 (2000), and then EPA withdrew the proposed rule. See 66 Fed. Reg. 41817 (Aug. 9, 2001). At no time was the new rule ever applied by EPA, and as things stand, the relevant regulations related to the Act are the same as they were in 1997. The statutory and regulatory regime – the applicable law – is the same now as it was when the consent decree was entered. There has been no change.

Nor has there been a change in factual circumstances sufficient to justify the district court's modification of the decree. It is true that the state of Georgia is not currently implementing the TMDLs established by EPA at the rate contemplated by the Act, but Georgia has never carried out its responsibilities under the Act at anywhere near the pace the Act contemplates. Georgia's governmental lethargy in this area is nothing new. Indeed, it was what Sierra Club calls "Georgia's 16 year failure and refusal to develop and implement the [TMDL] process for hundreds of Georgia's rivers, streams, lakes, and estuaries that were not meeting designated standards for fishing, swimming, and drinking," which led to the lawsuit. Brief of Appellee Sierra Club at 3. A decree cannot be justifiably modified based upon the theory of changed factual circumstances when the circumstances simply have not changed.

Sierra Club contends that the district court was within its discretion in modifying the decree because the decree had not achieved its purpose, and such a failure can itself be a changed circumstance justifying modification. See Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1539 (11th Cir. 1986); United States v. United Shoe Machinery Corp., 391 U.S. 244, 251-52, 88 S. Ct. 1496, 1501 (1968). That contention is based upon the premise that the purpose of the decree was to achieve clean water in Georgia, a state of

affairs which everyone concedes is a long way off. But the purpose of the decree was not nearly so ambitious. Clean water may have been Sierra Club's motivation, its reason for bringing the lawsuit to begin with, but the bargain it struck with EPA which produced the consent decree was much more limited.

While the Clean Water Act sets out a process composed of several steps to achieve clean water, the consent decree focuses on bringing about one of those steps, the establishment of TMDLs, and it leaves attainment of the Act's ultimate goal of cleaning up the water to the statutory and regulatory scheme which requires compliance by Georgia subject to some oversight by EPA. The consent decree does not supplant the Act itself. Under the decree, Georgia is still responsible for incorporating TMDLs, regardless of whoever establishes them, into its section 303(e) plan; Georgia is still responsible for incorporating TMDLs into its NPDES permits; and Georgia is still responsible for implementing non-point source pollution controls. EPA agreed only to a supervisory role with respect to some of these implementation-related processes, but it did not agree to take over the implementation process. The objective of the consent decree was the establishment of TMDLs, not the much more long-term goal of clean water.

Nothing has changed to make the provisions of the consent decree ineffective, and experience has not shown that the decree is incapable of achieving

28

its purpose. It is still capable of and is in fact accomplishing what the parties set out to achieve with the decree: the establishment of TMDLs. If Sierra Club wants more done to bring about clean water in Georgia, it will have to look beyond the consent decree and to the Clean Water Act and regulations, and perhaps to additional litigation, to achieve those worthy goals.

A party seeking to modify a consent decree has a high hurdle to clear and the wind in its face. See, e.g., Reynolds, 202 F.3d at 1312 ("Long standing precedent evinces a strong public policy against judicial rewriting of consent decrees."). Because Sierra Club has failed to clear that hurdle, the district court should not have modified the decree in the course of interpreting it. It should have granted EPA's motion to dismiss Sierra Club's motion to re-open the decree and to compel action.

## III. CONCLUSION

The district court's order denying EPA's motion to dismiss Sierra Club's motion to re-open and compel action is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.