[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 5, 2003
THOMAS  K. KAHN
CLERK

_____

No. 03-11263

_____

D. C. Docket No. 94-02501-CV-MHS-1

SIERRA CLUB,

Plaintiff,

GEORGIA ENVIRONMENTAL ORGANIZATION, INC.,
COOSA RIVER BASIN INITIATIVE, INC., et al.,

Plaintiffs-Appellees,

versus

JOHN HANKINSON, Regional Administrator, et al.,

Defendants,

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(December 5, 2003)**

Before ANDERSON, BARKETT and RONEY, Circuit Judges.

BARKETT, Circuit Judge:

The United States Environmental Protection Agency (EPA) appeals from the district court's award of $139,963.57 in attorneys' fees to the Georgia Environmental Organization and other environmental association appellees for monitoring EPA compliance with a 1997 consent decree. The EPA argues that the district court abused its discretion by awarding fees for work that allegedly exceeded the scope of the consent decree and by allowing compensation for expert witnesses who assisted in monitoring compliance with the consent decree but who did not testify in any proceeding. We affirm.

This appeal arises out of protracted litigation to force the state of Georgia and the EPA to comply with their obligations under the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq. Under the CWA, every state must categorize the designated uses of each body of water in its territory and set appropriate water quality standards based upon those uses. 33 U.S.C. § 1313(a)-(c). In addition, every discharger of a pollutant from a discrete, "point" source must obtain a National Pollutant Discharge Elimination System (NPDES) permit from the EPA (or an approved state agency) that specifies the exact level of discharge permitted. Id. at § 1342. In some areas, however, pollution from diffuse, "non-point" sources

such as agricultural runoff renders water quality standards unattainable through point-based NPDES permits alone. In such a case, the state must assemble a list of these "water quality limited segments" (WQLS). Id. at § 1313(d). For each body of water on a WQLS list, the state must establish a Total Maximum Daily Load (TMDL), which specifies the highest level of each pollutant that may pass through each day. States are expected to implement TMDLs through a combination of appropriately stringent point source permits and other measures aimed at non-point sources.

The EPA is responsible for approving WQLS lists and TMDLs generated by the states. Moreover, if a state fails to fulfill its duty under the CWA, the EPA is also responsible for initial generation of the lists and standards. See also Sierra Club v. Meiburg, 296 F.3d 1021, 1024-27 (11th Cir. 2002) (describing the CWA in more detail).

Georgia ignored its obligation to produce a WQLS list for thirteen years after the 1979 statutory deadline for submission. Then, in 1992, Georgia produced only a partial list. Sierra Club v. Hankinson, 939 F. Supp. 865, 868 (N.D. Ga. 1996). Two years later, in light of Georgia's failure to comply adequately with the requirements of the CWA, the Sierra Club and other environmental organizations filed suit under 33 U.S.C. § 1365(a) to force the EPA to update the WQLS list and

issue TMDLs. The district court granted summary judgment and ordered the EPA to issue complete TMDLs on a relatively strict five-year schedule. Id. at 873. While the government appeal was pending, the parties entered into a consent decree requiring that the EPA review and update Georgia's WQLS list. Order of Dec. 17, 1996. The following year, the parties signed a second consent decree setting a timetable for the EPA to establish TMDLs for each body of water on Georgia's (biannually updated) WQLS list. Order of Oct. 16, 1997.

The EPA submitted the first list of proposed TMDLs for 124 water segments along with the consent decree, but two years later, Georgia had yet to incorporate them into its water management plans, and neither the state nor the EPA had moved to implement them in other ways. Meiburg, 296 F.3d at 1028. The Sierra Club moved the district court to reopen the decree and compel further action, and Georgia promised to develop implementation plans within nine months. Once Georgia's plans had been issued, the EPA moved to have the Sierra Club motion dismissed as moot, but the district court ruled that implementation plans formed part of the consent decree and that the EPA therefore had an obligation to ensure that the plans were adequate. Id. In Sierra Club v. Meiburg, this Court rejected the district court's interpretation and held that implementation plans did not fall within the terms of the consent decree. Id. at 1030-32.

4

The plaintiffs also requested payment of costs and attorneys' fees under 33 U.S.C. § 1365(d) for their work in monitoring EPA compliance with the consent decree. In light of this Court's ruling in Meiburg, the district court struck all requests for fees relating to TMDL implementation. The court also eliminated time spent on redundant work, general background research, unsuccessful motions, and certain specific litigation issues. The district court then awarded $139,963.57 to the remaining environmental plaintiffs,[1] which included $30,425.61 for expenses associated with expert witness Barry Sulkin. The EPA timely appealed.

We review a district court award of attorneys' fees for abuse of discretion. ACLU v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999). A district court has "wide discretion" in exercising its judgment on the appropriate fee level, though the court must articulate the decisions it makes, give principled reasons for those decisions, and show the specific fee calculations. Norman v. Housing Authority of Montgomery, 836 F.2d 1292, 1304 (11th Cir. 1988). A district court abuses its discretion when it fails to apply the appropriate legal standard, follows improper procedures, or relies upon clearly erroneous findings of fact. ACLU, 168 F.3d at 427.

---

[1]The Sierra Club settled its fee dispute separately and is not part of this appeal.

A district court may award fees for post-judgment monitoring of a consent decree. Penn. v. Del. Valley Citizens' Council, 478 U.S. 546, 557-61 (1986). However, such work must be relevant to the rights established by the decree and related to the terms of the judgment. Brooks v. Ga. State Bd. of Elections, 997 F.2d 857, 864 (11th Cir. 1993).

The EPA argues that the district court awarded fees for work beyond what was reasonably necessary to monitor compliance with the consent decree. Relying upon our decision in Meiburg, the EPA claims that the consent decree merely obligated the agency to establish TMDLs in some form. Although the EPA concedes that the plaintiffs may recover the costs necessary to determine *whether* the agency promulgated standards, the EPA insists that the plaintiffs did not have to examine the standards in any detail. According to the agency, "[o]ne does not have to review the content of the TMDLs and assess their validity to decide if EPA fulfilled its obligation to establish them as required by the decree."[2]

We do not agree with such a crabbed reading of our prior decision or of the consent decree itself. In Meiburg, we simply noted that implementation plans

_____

[2]Although at one point during oral argument counsel suggested that the EPA only objected to *excessive* time spent examining the content of the TMDLs, the agency briefs repeatedly stress only that TMDL content and compliance with relevant standards fell outside of the consent decree. We decline to entertain the *excessive* time argument suggested at oral argument.

were not mentioned within the definition of TMDL, within the list of EPA obligations, or anywhere within the consent decree. 296 F.3d at 1030. As a result, by reading an implementation requirement into the consent decree, the district court had "changed the legal relationship of the parties" and in effect modified the decree. Id. at 1032.[3]

By contrast, the plaintiffs' review of the content of the TMDLs and the WQLS lists relates to both specific language in the consent decree and the definitions incorporated by reference. The decree defines a relatively rigid timetable for the EPA to establish TMDLs over a period of some six years, and each TMDL "shall be established at a level necessary to implement the applicable water quality standards." See 33 U.S.C. § 1313(d)(1)(C) (incorporated by reference into Consent Decree at 9). The EPA must conduct "a biennial review of the TMDL program in Georgia," including "whether the TMDLs . . . have been incorporated into Georgia's NPDES permits." Consent Decree at 16. Moreover, each stage of TMDL proposals by the EPA relates to a new WQLS list promulgated by the state of Georgia, making review of the underlying WQLS lists essential to monitoring the TMDLs themselves. Consent Decree at 11-14. The

---

[3]In fact, the decree explicitly states that the EPA "does not obligate itself to perform, or ensure the performance of" the incorporation of TMDLs into future Georgia/EPA Performance Partnership Agreements. Consent Decree at 15.

EPA also agreed to "propose incorporation" of language linking TMDLs and the NPDES permits "into future Georgia/EPA Performance Partnership Agreements (PPA)." Consent Decree at 15. Given this explicit language within the consent decree, we agree with the district court that examination of the content of the TMDLs, WQLS lists and PPAs was "necessary to meaningful enforcement of the Consent Decree." Order at 7. This information certainly appears "relevant to those rights" established by the decree and "related to terms of the judgment," as required under our decision in Brooks. 997 F.2d at 864.

The EPA also argues that a consent decree clause reserving the right of the plaintiffs to challenge the TMDLs in the future implies that the consent decree covered only the existence of the standards rather than their compliance with applicable laws. Similarly, the EPA claims that challenges to future TMDLs would require "different issues and new administrative records," implying that such claims are distinct from any rights secured by the consent decree. However, the possibility of a future, separate TMDL challenge does not imply that all issues relating to TMDLs would have to be litigated separately. Had the plaintiffs discovered that certain TMDL standards were so patently inadequate that they did not meaningfully implement the consent decree, the plaintiffs could have returned to the district court and requested enforcement. Given that the consent decree

granted the court jurisdiction to issue orders "necessary or appropriate to construe, implement, modify, or enforce" the decree, Consent Decree at 7-8, and given that the court found review of TMDL content "necessary to meaningful enforcement," Order at 7, the district court might have considered such an action to be within the terms of the decree. As explained above, our decision in <u>Meiburg</u> does not suggest otherwise.

Finally, the EPA argues that the relevant fee-shifting provision does not cover a non-testifying expert witness. Under the terms of the CWA, a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). In this case, the district court awarded expert witness fees to plaintiffs' expert Barry Sulkin, noting that the litigation had been especially complex and that he had "helped plaintiffs prevail."

The government seizes on this phrase, arguing that the expert could not have helped the plaintiffs "prevail," since at most he helped to monitor an established consent decree. While the word may not have been entirely accurate, the plaintiffs are still "prevailing or substantially prevailing" within the context of monitoring an environmental consent decree. As the Fourth Circuit explained,

if we do not interpret "prevailing" in light of the goals of the Clean Water Act, the legislative purpose in awarding fees will be frustrated. The legislative history of the fee shifting provisions indicates that they were enacted to encourage litigation to ensure proper administrative implementation of the environmental statutes. Both the Clean Air Act and section 1365(d) authorize a court to award fees whenever it determines that such award is appropriate . . . Unlike plaintiffs in traditional civil actions, plaintiffs in environmental suits do not seek to vindicate personal rights and they obtain no financial benefit if they win.

National Wildlife Federation v. Hanson, 859 F.2d 313, 316-17 (4th Cir. 1988).

Similarly, the cases cited by the EPA do not apply to the monitoring of a post-judgment consent decree. In Sierra Club v. EPA, 769 F.2d 796, 812 (D.C. Cir. 1985), a D.C. Circuit panel denied expert witness fees to a "technical consultant" who had assisted the attorneys in preparing a general challenge to Clean Air Act regulations. As with all the cases cited by the EPA, however, Sierra Club involved the use of an expert in preparation for litigation that actually commenced rather than the monitoring of a consent decree. Moreover, Sierra Club predated Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546 (1986), the key Supreme Court case establishing the intimate connection between initial litigation and the post-judgment monitoring of a consent decree.

In Delaware Valley, an environmental group challenged the failure of the Pennsylvania state government to comply with its obligation under the Clean Air Act to establish a vehicle emissions program. The parties entered into a consent

10

decree requiring the state Department of Transportation to seek legislation instituting an inspection program and, if that proved unsuccessful, to promulgate regulations allowing inspections in certified private garages. Despite the consent decree, the dispute dragged on for several years. The state legislature both refused to enact legislation and attempted to block expenditure of state funds on a private program, while the executive branch delayed issuance of the specified regulations. The parties modified the consent decree on several occasions, and the court twice found the state in violation of the decree. Id. at 549-53.

The Delaware Valley plaintiffs sought attorneys' fees under the fee-shifting provisions of the Clean Air Act, 42 U.S.C. § 7604(d).[4] The Commonwealth objected that any time spent monitoring the consent decree outside of preparation for actual litigation fell outside the scope of § 7604(d), which covered only "costs of litigation" in any "action brought" pursuant to the statute. The Supreme Court rejected this argument, noting that Congress enacted the fee-shifting provision in order to "encourage citizen participation in the enforcement of standards and

---

[4]The Clean Air Act fee-shifting provisions are substantially similar to the CWA provisions. Compare 42 U.S.C. § 7604(d) ("The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.") with 33 U.S.C. § 1365(d) ("The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate.").

11

regulations established under this Act." 478 U.S. at 560 (quoting S. Rep. No. 91-1196 (1970)). The Court examined the specific provisions of the consent decree and concluded that it "provided detailed instructions as to how the program was to be developed and the specific dates by which these tasks were to be accomplished. Protection of the full scope of relief afforded by the consent decree was thus crucial to safeguard the interests asserted . . . ." Id. at 558. The case at hand also required significant post-judgment monitoring in order to protect the relief afforded plaintiffs through the consent decree. We therefore look to Delaware Valley for guidance in this case.

The role of expert witnesses in post-judgment consent decree monitoring appears to be a question of first impression. Nonetheless, we are guided by the Supreme Court's observation that "measures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which [plaintiffs] prevailed in securing the consent decree." Id. at 559. As this Court has recognized, Delaware Valley "employed a pragmatic test over a technical one in construing the attorney's fees statute." Brooks, 997 F.2d at 863. That is, the Supreme Court placed more weight on the nature of the rights secured by the consent decree and the measures necessary to secure those rights than on the technical definition of "litigation costs."

12

In the present case, protection of the rights enshrined in the consent decree depends upon highly technical, post-judgment monitoring and evaluation of discharge levels, including the intricacies of pollution movement through various water bodies and associated sediment. Given the absence of a hearing at which an expert could testify and the importance of his work to the enforcement of the consent decree, we cannot say that the district court abused its discretion by determining that the plaintiffs were entitled to expert witness fees. See also Garrity v. Sununu, 752 F.2d 727, 738-39 (1st Cir. 1984) ("The court was entitled to believe that relief would occur more speedily and reliably if the monitoring referred to occurred, and that this was a necessary aspect of plaintiffs' 'prevailing' in the case. We find no abuse of discretion in that part of the award.").

AFFIRMED.