[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11679

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 3, 2010
JOHN LEY
CLERK

D.C. Docket No. 06-61851-CV-UU

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

versus

RANDALL L. LESHIN,
RANDALL L. LESHIN, P.A.,
d.b.a. Express Consolidation,
EXPRESS CONSOLIDATION, INC.,
CHARLES C. FERDON,

Defendants-Appellants,

CONSUMER CREDIT CONSOLIDATION, INC.,
MAUREEN A. GAVIOLA,

Defendants.

_____

No. 09-12003

_____

D.C. Docket No. 06-61851-CV-UU

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

versus

RANDALL L. LESHIN,
RANDALL L. LESHIN, P.A.,
also d.b.a. Express Consolidation,
EXPRESS CONSOLIDATION, INC.,
CHARLES C. FERDON,

Defendants-Appellants,

DEBT MANAGEMENT COUNSELING CENTER, INC.,

Appellant,

CONSUMER CREDIT CONSOLIDATION, INC.,
MAUREEN A. GAVIOLA,

Defendants.

_____

Nos. 09-15972 & 10-10875
_____

D.C. Docket Nos. 06-61851-CV-UU
0:06-cv-61851-UU

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

versus

RANDALL L. LESHIN,

RANDALL L. LESHIN, P.A.,
also d.b.a. Express Consolidation,
EXPRESS CONSOLIDATION, INC.,
CHARLES C. FERDON,

Defendants-Appellants,

DEBT MANAGEMENT COUNSELING CENTER, INC.,

Appellant,

CONSUMER CREDIT CONSOLIDATION, INC., et al.,

Defendants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(September 3, 2010)

Before PRYOR and FAY, Circuit Judges, and QUIST,[*] District Judge.

PRYOR, Circuit Judge:

This consolidated appeal presents the question whether the district court

abused its discretion when it held the defendants in contempt for violating a

stipulated injunction and when it ordered the defendants to disgorge all fees

collected in violation of the injunction. The district court entered the injunction

_____

[*] Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

3

based on a complaint filed by the Federal Trade Commission against Randall Leshin, Randall Leshin, P.A., Express Consolidation, Inc., and Charles Ferdon for providing debt consolidation services in violation of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 53(b), 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, id. §§ 6101–6108. After entry of the injunction, the Commission moved for an order to show cause why the defendants and the Debt Management Counseling Center, Inc., a nonparty acting in concert, should not be held in contempt. After briefing and a two-day hearing, the district court held the defendants and the Counseling Center in contempt of the injunction and entered sanctions against them. We affirm.

## I. BACKGROUND

We divide our discussion of the background of this appeal in three parts. First, we address the complaint and the stipulated injunction. Second, we address the clarification of the injunction by the district court. Third, we address the contempt proceedings and order of disgorgement.

*A. The Complaint and the Stipulated Injunction*

As early as August 2003, Randall Leshin, an attorney from Florida, controlled Randall L. Leshin, P.A., and Express Consolidation, Inc., and used these entities to secure tens of thousands of contracts for debt consolidation. Leshin

4

serves as the president of Express and, until January 2009, Charles Ferdon served as the vice president, secretary, and general manager of Express. Under the contracts for debt consolidation or debt management Leshin, P.A., and Express acted as intermediaries between consumers and their creditors for the purpose of obtaining more favorable terms of payment.

On December 12, 2006, the Federal Trade Commission filed a complaint against Randall Leshin; Randall L. Leshin, P.A.; Express Consolidation, Inc.; and Charles Ferdon. The complaint alleged that the defendants were conducting "unfair or deceptive acts or practices in or affecting commerce" and deceptive telemarketing practices and other abusive telemarketing acts or practices in violation of the Federal Trade Commission Act, id. §§ 45(a), 53(b), 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, id. §§ 6101–6108. In an amended complaint, the Commission requested injunctive relief, imposition of a constructive trust on consumer fees, and the equitable remedies of disgorgement of profits, restitution, and rescission of the illicit contracts for debt consolidation.

The amended complaint also alleged that the defendants engaged telemarketers to conduct illegal telemarketing campaigns, which sent over 6.4 million prerecorded solicitation messages to prospective customers nationwide.

5

These messages announced that Express Consolidation, a certified nonprofit organization, was offering to reduce dramatically the credit card payments of consumers. As alleged, these actions violated the Telemarketing Sales Rule, 16 C.F.R. § 310, and other restrictions on automated telemarketing by disabling any consumer who answered the phone to connect to a live sales representative, delivering messages to thousands of people on the National "Do Not Call" Registry, and placing repeated calls to consumers who specifically requested not to be called by Express or telemarketers working on its behalf. The complaint alleged that the defendants mischaracterized the status of Express as a nonprofit entity, when in truth, Leshin or Leshin, P.A., a for-profit entity, received all fees from the contracts. In addition, the complaint alleged that the defendants misrepresented critical terms of the contracts for debt consolidation by making false claims about the program fees, the effects on interest rates and credit reports, and the total savings that would result from the program. The advertisements and contracts falsely represented that the defendants were qualified to offer services in every state and that any fees were adjusted to conform to state requirements, when in truth no fees were adjusted to comply with state limitations and the defendants were not qualified to offer services in a number of states.

In early 2007, after the Commission filed its complaint, Leshin and Ferdon

incorporated Debt Management Counseling Center, Inc., and directed the employees of Express to secure contracts for debt consolidation in the name of the Counseling Center. The Counseling Center is wholly owned by RLL Holding Company, of which Leshin is the sole shareholder and director. Ferdon served as the president of the Counseling Center. The Counseling Center has only two directors, Matt Wiley and Michael Bradford, both of whom are employees of Express. The Counseling Center has no employees and Leshin controls and supervises the actions of its directors and officers. The Counseling Center was never named as a defendant in the complaint filed by the Commission.

In March 2008, the defendants agreed to settle the charges against them, and the parties stipulated to an injunction, which the district court entered on May 5, 2008. Although the Counseling Center was not a named defendant in the original complaint, many provisions of the injunction apply to the Counseling Center, and Leshin acknowledged on behalf of the shareholders of the Counseling Center that they had received a copy of the injunction. The injunction enjoined the named defendants and their representatives, which the injunction defined as "successors, assigns, officers, agents, servants, employees and those persons in active concert or participation with Defendants who receive actual notice of this Order by personal service or otherwise." The injunction enjoined the defendants and their

7

representatives from making certain false representations regarding their services for debt consolidation or engaging in deceptive or abusive telemarketing practices; charging fees, or executing contracts with fees, that "are prohibited by or exceed applicable restrictions under state law" in the state in which the consumer resides; failing to comply with all requirements of state law, including "licensing, registration, reporting, audit, insurance, [and] escrow account" requirements in the state in which defendants offer services for debt consolidation; and "[o]ffering, entering into, or accepting the transfer of, a contract for debt consolidation services with a person when Defendants are not, at the time of the offer, transfer or execution of the contract, in compliance with legal requirements imposed by the state in which the person resides."

The injunction also appointed a temporary monitor "for the purpose of monitoring certain payments and accounts, [and] providing notice to existing customers." The injunction required the monitor to notify "existing clients" of the defendants and inform them of their rights. "Existing clients" are defined as persons who signed a contract for debt consolidation with the defendants, "including contracts under the name 'Debt Management Counseling Center,' . . . or Debt Management Counseling Center, Inc."; have not notified the defendants that they are canceling their contracts; and have made payments under the contracts to

8

Leshin, Leshin, P.A., or the Counseling Center during the sixty days before entry of the injunction.

The injunction divided the monitor's task of notifying existing clients between those states where Express was legally qualified to provide services for debt management and those where it was not. The injunction defined when Express is "qualified to provide debt management services" in a state. If a state did not issue licenses for entities that offer or provide services for debt consolidation, the injunction required the defendants, within thirty days of the date of the injunction, to have "fulfilled any requirements imposed by state law to provide such services, including any registration, reporting, audit, insurance, escrow account or trust account requirements." If a state issued licenses for such entities, the injunction required the defendants, within sixty days of the date of the injunction, to have either a valid license from the state authority or a pending application for a valid license, in which "the state has unambiguously stated in writing that it will permit Express . . . to offer debt consolidation services to residents of that state who are currently being serviced by Express . . . for debt consolidation services based on the pending application."

Clients in states where Express was not legally qualified to provide services were to receive notice that they could cancel their contracts immediately or

9

contract with the provider identified by the Commission. If the existing clients in these states failed to inform the monitor of their preferences within 120 days of the injunction, their contracts would be transferred to the provider identified by the Commission. Clients in states where Express was legally qualified to provide services, but whose contracts were signed with Leshin or Leshin, P.A., were to receive notice that they could cancel their contracts immediately, contract with the provider identified by the Commission, or transfer their contracts to Express. If the existing clients in these states failed to inform the monitor of their preference within 120 days of the injunction, their contracts would be transferred to Express. Under the injunction, if a client elected to cancel a contract, the defendants were required to cease collection from that client within three days.

The injunction also ordered Leshin, Leshin, P.A., and Express to pay $40 million and Ferdon to pay $380,000 for restitution to consumers. These funds were to be deposited in a specified trust account under the control of the court-appointed monitor and used primarily to pay the creditors of existing clients, with the remaining balance to be paid to a fund administered by the Commission to be used for monetary redress to consumers and for administration of that fund.

Soon after the entry of the injunction, the Counseling Center transferred its contracts to Express. As of May 15, 2008, Express had accepted the transfer of all

10

the contracts of the Counseling Center, including contracts from states in which Express was not in compliance with state law.

*B. Clarification of the Injunction*

On June 30, 2008, after entry of the injunction, the defendants filed an emergency motion under Federal Rule of Civil Procedure 60(b) requesting an extension of time to comply with the injunction, additional time to obtain licenses or come into compliance with state law in twelve states, and permission to continue to provide services for debt consolidation in those states. The defendants alleged that the Commission intentionally interfered with their efforts to comply with the injunction by issuing a misleading press release about their culpability and sending a dossier to various "state[s] where Defendants sought approval to do business." The Commission and the defendants also disagreed about the states in which Express was legally qualified to provide services. The monitor filed motions for the district court to clarify in which states the defendants were in compliance so the monitor could determine which notice he needed to send.

The district court conducted an evidentiary hearing to resolve all of these issues and determined that Express was qualified to operate in four of the contested states, and was not qualified in 21 states. The district court denied the Rule 60(b) motion for additional time to comply with the injunction or to obtain licenses

11

because the defendants could have anticipated the regulatory timeframe and there was no equitable basis for modifying or extending the deadlines to which the parties had stipulated previously. The district court directed the monitor to send out the required notices by July 25, 2008, and the monitor complied.

After the district court entered its order, the defendants, with the assistance of the Counseling Center, sent out their own notices to clients in eight of the states in which the district court had ruled Express was not legally authorized to conduct debt consolidation. The notices encouraged clients to "cancel" their original contracts and immediately sign new contracts with the Counseling Center or one of the other defendants. The notices promised the clients that this process would allow clients to continue their debt management plans and that Express would service these contracts.

After the district court clarified that Express was not qualified to conduct business in certain states, Express transferred back to the Counseling Center those contracts it had previously accepted where, at the time of acceptance, Express was not qualified to conduct business. Express had accepted the transfer of 721 contracts with Florida residents, 701 contracts with Georgia residents, 600 contracts with Ohio residents, 287 contracts with Tennessee residents, and 169 contracts with Kentucy residents. Florida, Georgia, Ohio, Tennessee, and Kentucy

12

were among the 21 states in which the district court ruled Express was not qualified to conduct business.

### C. Contempt Proceedings and the Final Order of Disgorgement

On January 28, 2009, the Commission moved the district court to direct the defendants and the Counseling Center to show cause why they should not be held in civil contempt. The Commission alleged that the contempt defendants continued to solicit and execute contracts for debt consolidation with customers in states where the district court had ruled they were not authorized to conduct business, and continued to collect payments from customers in the same states despite specific provisions enjoining them from doing so. The district court entered an order to show cause and ordered the contempt defendants to respond by February 9, 2009. The district court held an evidentiary hearing and the parties filed briefs and proposed findings of fact and conclusions of law on the matter. On March 27, 2009, the district court issued its findings of fact and conclusions of law and held the defendants and the Counseling Center in contempt.

The district court found that the Commission had proved by clear and convincing evidence that the defendants, and the Counseling Center acting in concert, had violated the injunction in three ways. First, the district court found that the contempt defendants continued to collect from existing clients who

cancelled their contracts in response to notices sent by the monitor. Second, Express had accepted transfers of contracts from the Counseling Center for persons who resided in states where Express, at the time of the transfer, was not in compliance with state law. Third, the defendants and the Counseling Center offered and executed contracts in states where the defendants were not in compliance with state law when they offered or executed the contracts.

As part of the remedy, the district court held that the injunction should be modified to effectuate its purpose following its violation. The contempt order detailed the proposed modifications, but did not modify the injunction. The district court later entered a separate order that modified the injunction.

The contempt order also ordered that the contempt defendants "effect complete compensation to those aggrieved by the contempt" and "disgorge all amounts collected from consumers" who "are parties to the . . . post-order consumer contracts" the district court found to be unlawful. The district court concluded that it was "unable to compute the exact amounts to be disgorged from the exhibits" and directed the monitor "to determine the amount to be disgorged."

Over seven months, from May 2009 through January 2010, the monitor submitted a series of reports updating his calculation of the fees to be disgorged based on information he continuously gathered from the defendants. The contempt

14

defendants objected to some of the calculations in these reports, and the district court accepted a few of these objections and directed the monitor to adjust his calculations accordingly.

On January 28, 2010, the district court entered its final judgment of disgorgement and consumer redress. The district court found that the total amount of fees to be disgorged was $594,987.90. The final order of disgorgement specifically stated that it was entered "to remedy contempt via disgorgement and [was] not a money judgment." The district court stated that the judgment "provides monetary relief for civil contempt, is solely remedial in nature, and is not a fine, penalty, punitive assessment, or forfeiture." The district court also included in the order of disgorgement that the Commission "may apply to the Court to convert any unpaid balance of this civil contempt remedy to a money judgement." The defendants and the Counseling Center were ordered to disgorge this amount within 30 days of January 27, 2010.

## II. STANDARDS OF REVIEW

We review an order of civil contempt for an abuse of discretion. Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002). If the record evinces "that a reasonable person could find a clear and convincing violation" of the consent decree, "we must affirm the contempt ruling of the district court." Howard

15

Johnson Co. v. Khimani, 892 F.2d 1512, 1516 (11th Cir. 1990). "[T]he rules we use to interpret a consent decree are the same ones we use to interpret a contract—since a consent decree is a form of contract." Sierra Club v. Meiburg, 296 F.3d 1021, 1029 (11th Cir. 2002) (internal quotation marks omitted). "We review de novo the threshold question of whether a contract is ambiguous." Frulla v. CRA Holdings, Inc., 543 F.3d 1247, 1252 (11th Cir. 2008). "A contract is ambiguous where it is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract." Id. (internal quotation marks omitted). "[W]e . . . construe any ambiguities or uncertainties in such a court order in a light favorable to the person charged with contempt." Ga. Power Co. v. NLRB, 484 F.3d 1288, 1291 (11th Cir. 2007). We review the interpretation of state law de novo. Salve Regina Coll. v. Russell, 499 U.S. 225, 231, 111 S. Ct. 1217, 1221 (1991).

We review the remedial relief granted as a contempt sanction for an abuse of discretion. McGregor v. Chierico, 206 F.3d 1378, 1388 (11th Cir. 2000); United States v. City of Miami, 195 F.3d 1292, 1298 (11th Cir. 1999). We review de novo the classification of a contempt sanction as civil or criminal. In re E.I. DuPont De Nemours & Co.-Benlate Litig., 99 F.3d 363, 367 (11th Cir. 1996). "[W]e review findings of fact arising out of contempt proceedings under the clearly

16

erroneous standard." <u>Doe v. Bush</u>, 261 F.3d 1037, 1047 (11th Cir. 2001).

## III.  DISCUSSION

Although the contempt defendants raise numerous arguments on appeal, we elaborate on only five of the arguments of the contempt defendants.  First, we discuss whether the district court abused its discretion by holding the defendants in contempt.  Second, we address whether the district court abused its discretion by holding the Counseling Center, a nonparty, in contempt, Leshin and Ferdon individually liable, and the contempt defendants jointly and severally liable.  Third, we discuss whether it was within the discretion of the district court to order the contempt defendants to disgorge all fees collected as a result of the contemptuous acts and whether the district court committed any error in calculating the amount of disgorgement.  Fourth, we address whether the sanction to disgorge all fees was a civil contempt sanction or a criminal contempt sanction that violated the contempt defendants' right to due process.  Fifth, we address whether we have jurisdiction to review an argument that the district court abused its discretion when it added a provision in the final order of disgorgement that allows the Commission to convert the unpaid balance of the disgorgement into a money judgment.  We affirm the district court and, unless otherwise stated, do so for the reasons stated in its well-reasoned orders.

17

*A. The District Court Did Not Abuse Its Discretion by Holding the Defendants in Contempt.*

The contempt defendants contend that the district court abused its discretion by holding them in contempt of ambiguous provisions after they had made a good faith effort to comply with the injunction. A finding of civil contempt must be supported by clear and convincing evidence that "the allegedly violated order was valid and lawful; . . . the order was clear and unambiguous; and the . . . alleged violator had the ability to comply with the order." Riccard, 307 F.3d at 1296. "Once this prima facie showing of a violation is made, the burden then shifts to the alleged contemnor to produce evidence explaining his noncompliance at a 'show cause' hearing." Chairs v. Burgess, 143 F.3d 1432, 1436 (11th Cir. 1998) (internal quotation marks omitted). Neither party challenges the validity of the injunction or the ability of the defendants to comply with the injunction.

1. Offering or Executing New Contracts in States Where Express Was Not Qualified to Conduct Business Violated the Injunction.

The contempt defendants argue that the district court erred when it found that they were not in compliance with state law when they offered or executed contracts in several states. They argue that they made a "good faith effort" to comply with the injunction, that no consumers were "harmed or prejudiced by . . .

18

[their] technical, if at all, noncompliance," and that their substantial compliance made the contempt order unwarranted. We disagree.

The Supreme Court has made clear that the absence of willfulness is not a defense to a charge of civil contempt. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S. Ct. 497, 499 (1949). The decisions of our Court and our predecessor court have held that substantial, diligent, or good faith efforts are not enough; the only issue is compliance. Combs v. Ryan's Coal Co., 785 F.2d 970, 984 (11th Cir. 1986); see also Newman v. Alabama, 683 F.2d 1312, 1318 n.16 (11th Cir. 1982); Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am., 609 F.2d 165, 168 (5th Cir. 1980) ("[I]n civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order." (alteration in original) (internal quotation marks omitted)). We do not focus "on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue." Ga. Power Co., 484 F.3d at 1291 (internal quotation marks omitted).

The district court did not clearly err when it found that the defendants failed to comply with the laws of Florida, Georgia, Ohio, and Tennessee. The laws of these states require that providers of debt consolidation services maintain insurance

19

coverage for employee dishonesty, forgery, and computer fraud. Fla. Stat. § 817.804(1)(b); Ga. Code Ann. § 18-5-3.1(a)(2); Ohio Rev. Code Ann. § 4710.02(E); Tenn. Code Ann. § 47-18-104(b)(39)(A)(vii). The defendants had an insurance policy from Travelers with an endorsement that excluded coverage for losses of money, securities, and property of others caused by employee theft, computer fraud, or any fraudulent transfer of funds. The policy also excluded coverage for employee theft of client property. Coverage for employee theft, which is a form of employee dishonesty, was required in Florida, Georgia, Ohio, and Tennessee.

The defendants conceded before the district court that "[i]n real life . . . there's an issue" with the policy, and classified its noncompliance as "excusable neglect." We are not concerned with excusable neglect but with whether the contempt defendants complied with the injunction. They did not. Because the defendants and their representatives were required to be in compliance with state law when they offered or executed contracts, the district court did not abuse its discretion in finding the defendants, and the Counseling Center, in contempt for offering or executing post-order contracts in Florida, Georgia, Ohio, and Tennessee.

The district court also did not abuse its discretion by holding the defendants

and the Counseling Center in contempt for entering into contracts in Kentucky, Nevada, Texas, and California. The defendants conceded that Express failed to comply with the registration requirements in Kentucky for debt adjusters, which include those who service contracts for debt consolidation. Ky. Rev. Stat. Ann. §§ 380.010(2); 380.040(5). Despite this failure, Express entered into 37 new contracts in Kentucky and continued to service the 126 new contracts entered into by the Counseling Center. Regarding Nevada, the record also proved Express failed to procure either the required license for debt adjusters, Nev. Rev. Stat. § 676.110, or a credit services organization certificate, id. §§ 598.721, 598.741. In Texas, the law requires all providers of debt consolidation services to be accredited, see 7 Tex. Admin. Code § 88.304(a), yet the contempt defendants offered or executed post-order contracts before August 8, 2008, the day they received accreditation. Additionally, the record supports the finding by the district court that the defendants were not in compliance with California law. Leshin and Leshin, P.A., were not exempt from California prorater laws, Cal. Fin. Code §§ 12200, 12002.1, 12100(c), and violated the injunction when Express solicited California consumers to execute contracts with Leshin, despite having received a "Desist and Refrain Order" from the Department of Corporations of California on July 15, 2008. Because the defendants were not in compliance with the laws of

21

Kentucky, Nevada, Texas, and California at the time defendants offered or executed the post-order contracts in these states, the district court did not abuse its discretion in holding them in contempt.

### 2. Soliciting Existing Clients Violated the Injunction.

The contempt defendants do not dispute that they continued to collect from 971 "existing clients" who had elected to cancel their contracts after receiving notice from the monitor. The heart of the contempt defendants' argument is that, when existing clients received notice and chose to cancel their contracts, the existing clients became former clients and the defendants were permitted under the injunction to enter new contracts and collect on the new contracts. This argument fails.

The injunction is unambiguous, and the contempt defendants' interpretation—that existing clients became former clients when they cancelled their contracts—would render paragraph A of section X of the injunction meaningless. This paragraph states that if the monitor receives a cancellation notice from an existing client, the defendants "shall discontinue all collections from that client." We read the term "existing clients," as defined by the injunction, to mean those clients with executory contracts when the injunction was executed. The defendants were required to cease collections from any existing client who

22

received the monitor's notice and elected to cancel his contract.

The record supports the finding that the contempt defendants repeatedly contacted clients even after the district court found Express to be unqualified to do business in those states. A telephone script, approved by Leshin, instructed telemarketers to solicit existing clients by stating, "Cancel your current contract by selecting option 2 on the notice, and then authorize [the Counseling Center] to continue your [contract]." The script promised the clients that "[e]verything will stay the same and . . . that Express Consolidation will continue to service your [contract] without any disruption." The contempt defendants admitted to sending these notices after the district court clarified those states in which Express was not qualified to do business. They admitted to having had the idea during the hearing for clarification, but they chose not to seek approval by the district court. The contempt defendants continued to collect from 971 existing clients that had responded to the monitor's notice and elected to cancel their contracts. Because the 971 existing clients from whom the contempt defendants continued to collect had notified the monitor that they were electing to cancel their contracts, the contempt defendants, and the Counseling Center acting in concert with them, violated paragraph A of section X by soliciting new contracts and collecting on these contracts.

### 3. Accepting Transfer of Contracts from the Counseling Center When Express Was Not in Compliance with State Law Violated the Injunction.

The contempt defendants argue that the district court abused its discretion by holding Express, and the Counseling Center acting in concert with Express, in contempt for accepting the transfer of contracts from the Counseling Center when Express had not yet complied with state law. They argue that the requirement of the Counseling Center to transfer contracts to Express "was completely separate from all other requirements." They argue that the injunction "did not prohibit [Express]" from accepting the contracts of the Counseling Center. Alternatively, the contempt defendants argue that any error in accepting these transfers was cured when Express transferred back to the Counseling Center those contracts from states in which Express was not in compliance with state law.

The district court did not abuse its discretion by holding the defendants in contempt for accepting the transfer of contracts from the Counseling Center. Although section XII of the injunction required the Counseling Center to "transfer the contracts of [its] existing clients . . . to Express," section VI of the injunction unambiguously enjoined Express from accepting the transfer of contracts when it was not, at the time of the transfer, in compliance with state law. When we read the injunction as a whole, which we are required to do, nothing in it exempted Express from section VI. Stated differently, the Counseling Center may have been

24

required to transfer its contracts, but Express was specifically enjoined from accepting those contracts from states in which it was not in compliance with state law. Moreover, the contempt defendants' interpretation is unreasonable and divorces section XII from all other provisions of the injunction, including section VI, which unambiguously barred Express from accepting the transfer of these contracts. See Frulla, 543 F.3d at 1252 ("If the interpretation urged by one party is unreasonable in light of the contract's plain language, the contract is not ambiguous . . . ."). All parties, including the Counseling Center, were aware that at the time of the transfer Express was required to be in compliance with state law. Express and the Counseling Center through its officers at the time of the transfers—Leshin and Ferdon as officers of Express, Leshin as the sole shareholder of the Counseling Center, and Ferdon as an officer of the Counseling Center—proceeded at their peril. See McComb, 336 U.S. at 192, 69 S. Ct. at 500.

We reject the contempt defendants' argument that transferring the contracts back to the Counseling Center cured any violation of the injunction. The injunction required that Express be in compliance when it accepted the transfer of these contracts. The contempt defendants provide no authority to support that the retransfer of these contracts, after the violation had occurred, cured the violation. The record establishes that Express, even after it transferred the contracts back to

the Counseling Center, continued to service those contracts despite its noncompliance with state law.  Accordingly, the district court did not abuse its discretion by holding the defendants, and the Counseling Center acting in concert, in contempt for accepting the transfer of these contracts.

*B.  The District Court Did Not Err by Holding the Counseling Center in Contempt, by Holding Leshin and Ferdon Individually Liable, or by Holding the Contempt Defendants Jointly and Severally Liable.*

The contempt defendants argue that the district court erred by holding the Counseling Center, as a nonparty to the injunction, in contempt.  They also argue that the district court erred by holding Leshin and Ferdon individually liable and by holding all contempt defendants jointly and severally liable for disgorgement.  We address each of these arguments in turn.

An order binds those "who receive actual notice of it," including the parties, "the parties' officers, agents, servants, employees, and attorneys," as well as "other persons who are in active concert or participation with [them.]"  Fed. R. Civ. P. 65(d)(2).  The injunction not only binds the parties "but also those identified with them in interest, in 'privity' with them, represented by them[,] or subject to their control. . . . [The] defendants may not nullify [the injunction] by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."  Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14, 65 S. Ct. 478,

26

481 (1945). Many provisions in the injunction, including those provisions for which the district court held the defendants and the Counseling Center in contempt, enjoin the named defendants and their representatives, "those persons in active concert or participation with Defendants who receive actual notice of [the injunction]."

The district court did not abuse its discretion by holding that the Counseling Center acted in concert and was bound by the injunction. The Counseling Center received actual notice of the injunction. The district court found that the Counseling Center is wholly owned by Leshin, P.A., it had no employees, Ferdon served as the president, the only two directors were also employees of Express, and Leshin controls and supervises the actions of the directors and officers of the Counseling Center. The record supports the finding that the Counseling Center acted in active concert or participation with the defendants when it solicited existing clients to cancel and sign new contracts in violation of the injunction. Leshin also directed the Counseling Center, which in turn aided and abetted the defendants, to continue to collect from 971 existing clients who had cancelled their contracts. The Counseling Center also aided and abetted the defendants in procuring post-order contracts when they were not in compliance with state laws, and executed post-order contracts in the name of the Counseling Center, which

27

Express serviced despite its noncompliance. The district court did not abuse its discretion in holding the Counseling Center in contempt of the injunction as an active participant in the contemptuous conduct of the defendants.

The district court also did not abuse its discretion when it held Leshin and Ferdon individually liable for contempt and in contempt as officers of Express, Leshin, P.A., and the Counseling Center. The Supreme Court long ago held that individuals responsible for the affairs of a corporation can be individually held in contempt for disobeying a known injunctive order.

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt.

United States v. Fleischman, 339 U.S. 349, 357–58, 70 S. Ct. 739, 743–44 (1950) (emphasis omitted) (internal quotation marks omitted); see also Northside Realty Assocs., Inc. v. United States, 605 F.2d 1348, 1353 & n.9 (5th Cir. 1979) (explaining that "contumacious conduct on the part of . . . leaders . . . fully support[s] the Court's finding[] of contempt on the part of the corporation and the individual defendants," "[t]he acts of the . . . officers, done within the scope of their employment and for the benefit of their employer, are attributable to the corporate defendant," and "the acts of [the individuals] go not only to corporate

28

liability but to their personal liability as well" (citation omitted)).  The undisputed evidence established that Leshin wrote the script used to solicit existing clients in violation of the injunction.  Both Leshin and Ferdon, as officers of the defendant companies, participated in executing post-order contracts that violated the injunction.

Moreover, the district court did not abuse its discretion by holding the individual defendants jointly and severally liable for the disgorgement order. "Where . . . parties join together to evade a judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct."  NLRB v. Laborers' Int'l Union of N. Am., 882 F.2d 949, 955 (5th Cir. 1989); see also FTC v. Gem Merch. Corp., 87 F.3d 466, 470 (11th Cir. 1996); Connolly v. J.T. Ventures, 851 F.2d 930, 934–35 (7th Cir. 1988).  The record supports the finding that the contempt defendants together evaded the injunction.

*C. The District Court Did Not Abuse Its Discretion by Ordering Disgorgement as the Sanction for Contempt or in Calculating the Amount to Be Disgorged.*

The contempt defendants allege that, because no consumers were injured by their activity, the order of disgorgement should have been limited to its profits, not its gross receipts.  The contempt defendants argue that there was "no causal relationship between disgorged fees and any wrongdoing" because their

29

noncompliance was "purely technical." The contempt defendants argue that the district court erred because it did not find that they had engaged in fraud. The contempt defendants also contend that the final amount of disgorgement reflects erroneous calculations. We address each of these arguments in turn and reject them all.

1. Ordering Disgorgement of All Fees Collected in Violation of the Injunction Was Within the Discretion of the District Court.

The district court did not abuse its discretion in ordering disgorgement of gross receipts instead of profits. We have upheld a contempt sanction that required disgorgement of gross receipts, even though the consumer received some value from the product or service. See McGregor, 206 F.3d at 1388. Our sister circuits also have upheld disgorgement of gross receipts. See FTC v. Kuykendall, 371 F.3d 745, 766–67 (10th Cir. 2004) (en banc); see also FTC v. Febre, 128 F.3d 530, 536 (7th Cir. 1997) (losses under the Federal Trade Commission Act); FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605–06 (9th Cir. 1993) (same). Despite the contempt defendants' contention that no consumers were injured by their contumacious activity, consumers entered into contracts based on the misrepresentation that the defendants had the legal authority to conduct business. As a part of these contracts, consumers paid fees that they would not otherwise have paid. The district court was not required to find that the defendants had

30

committed fraud before ordering disgorgement. We afford the district court wide discretion in fashioning an equitable remedy in civil contempt, which includes ordering disgorgement, McGregor, 206 F.3d at 1385 n.5, and the district court did not abuse its discretion by requiring the contempt defendants to disgorge all fees collected on contracts procured in violation of the injunction.

2. The District Court Did Not Err When It Calculated the Final Amount of Disgorgement.

The contempt defendants contend that the monitor's calculations contained several errors, but the contempt defendants often fail to provide specific arguments or citations to the record for these contentions. To the extent that the contempt defendants have not waived their objections to the monitor's calculations, see Flanigan's Enters., Inc. of Ga. v. Fulton Cnty., Ga., 242 F.3d 976, 987 n.16 (11th Cir. 2001), their remaining arguments fail.

We reject the contempt defendants' argument that the district court abused its discretion by including fees collected by the Counseling Center in the order to disgorge all fees collected from existing clients. The district court found that the Counseling Center solicited existing clients on behalf of Express, Leshin, or Leshin P.A., after the clients had elected to cancel their contracts. The district court did not abuse its discretion by including those fees the Counseling Center collected or solicited at the direction of Leshin and in violation of the injunction.

31

We also reject the argument of the contempt defendants that the district court abused its discretion by including all fees collected by Express on account of the transfer of 600 Ohio contracts from the Counseling Center. The contempt defendants have failed to explain why requiring disgorgement of all fees collected by Express on those 600 contracts, even after Express transferred the contracts back to the Counseling Center, was erroneous. Express was not in compliance with Ohio "debt adjusting" law, which required Express, even as the service agent, to maintain adequate insurance coverage. Ohio Rev. Code Ann. § 4710.02(E). The district court found that Express continued to engage in debt adjusting services with regard to those 600 contracts transferred back to the Counseling Center despite that the injunction required Express to comply with all requirements under state law. The contempt defendants have not challenged this factual finding. The district court did not abuse its discretion by including those fees collected while Express was not in compliance with state law.

We also reject the argument that the district court abused its discretion by including fees that were held in trust or by including fees collected for non-sufficient funds or expediting. Although the contempt defendants contend that they did not retain the fees held in trust as revenue, they fail to point to any evidence in the record that these funds were paid out of trust to creditors. The

32

contempt defendants argue that the administrative fees are not charged as part of the monthly costs for services. This argument parallels the contempt defendants' argument that disgorgement of gross receipts is not compensatory. As we discussed above, this argument fails. See McGregor, 206 F.3d at 1388.

Ordering disgorgement of all fees collected serves to restore the consumer who would not otherwise have paid the fees or contracted for these services if the consumer had known the contempt defendants were not in compliance with state law. But for the contempt defendants' violation of the injunction, they would not have collected fees from the consumers, including those fees held in trust and collected for non-sufficient funds and expedite fees. The district court did not abuse its discretion.

The contempt defendants' remaining arguments challenging the final order of disgorgement are unsupported by legal or record citations and fail to establish an abuse of discretion. We will not grant relief where a litigant "fail[s] to elaborate or provide any citation of authority in support of the . . . allegation." Flanigan's Enters., Inc. of Ga., 242 F.3d at 987 n.16.

*D. The District Court Issued Civil Contempt Sanctions and Did Not Violate the Contempt Defendants' Right to Due Process.*

The contempt defendants argue that the district court imposed punitive or criminal contempt sanctions, which violated their constitutional right to due

33

process, and the contempt defendants argue that the district court violated their right to due process when it modified the injunction and then held them in contempt for violating these modified terms. We reject these arguments and conclude that the contempt sanctions entered by the district court are valid civil sanctions for violations of the original terms of the injunction.

It is well settled that "[a] contempt fine . . . is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'" Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 829, 114 S. Ct. 2552, 2558 (1994) (some alterations in original) (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 303–04, 67 S. Ct. 677, 701 (1947)). A contemnor need only be afforded the opportunity to purge his sanction of a fine, in the civil context, where a fine is not compensatory. Id. In the civil contempt context the discretion the district court has to impose noncoercive sanctions "is particularly broad and only limited by the requirement that they be compensatory." Howard Johnson, 892 F.2d at 1521.

The order to disgorge all fees collected in violation of the injunction is a civil sanction for contempt. The sanction to disgorge all fees collected from post-order contracts and from continuing to collect from existing clients is remedial in

34

nature. The order of disgorgement attempts to restore the status quo before the contempt defendants, in violation of the injunction, represented to consumers that they could lawfully enter into contracts in certain states. Moreover, the contempt sanctions are civil in nature because the sanctions were imposed to compensate consumers for the losses they sustained. Consumers, had they known the contempt defendants were not in compliance with state law, would not have entered into contracts for debt adjustment and would have paid no fees.

The district court did not deprive the contempt defendants of due process. The contempt defendants were afforded notice and an opportunity to be heard. They were placed on notice by the motion by the Commission, as well as prior motions to extend the monitor's tenure in the light of the defendants' failure to cancel existing clients in accordance with the injunction. The district court provided them an opportunity to be heard, both in written form and in oral form during a protracted two-day evidentiary hearing to show cause.

The district court also reasonably interpreted the injunction before it modified the injunction. The interpretation of the injunction did not modify the injunction because it did not "change[] the legal relationship of the parties." Sierra Club, 296 F.3d at 1029. Moreover, the interpretation is not such a gross misinterpretation of the original command that it "leaps from the page." Id.

35

(internal quotation marks omitted). The district court modified the injunction only after it held the defendants in contempt for violating the original terms of the injunction in the light of all the evidence.

*E. The Provision of the Final Order of Disgorgement that Allows the Commission to Convert the Unpaid Balance into a Money Judgment Is Not Ripe for Review.*

The contempt defendants argue that the district court abused its discretion when it provided in the final order of disgorgement that the Commission could apply to the district court to convert the unpaid balance of the disgorgement into a money judgment. The contempt defendants argue that "[b]y converting any unpaid balance of a civil contempt remedy to a money judgment, the [district] [c]ourt improperly eliminated [defendants'] right of the opportunity to purge the contempt by a showing of inability to pay." We lack jurisdiction to decide this issue.

This issue is not ripe for review. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259 (1998) (internal quotation marks omitted). The final order of disgorgement did nothing more than state that the Commission "may apply" for the order to be converted into a monetary judgment. (Emphasis added). The order did not convert the sanction into a monetary judgment. Furthermore, the contempt defendants' inability to pay may be relevant to and provide a defense for contempt if they fail

36

to comply with the order of disgorgement, but it is not relevant to the current appeal.  See Chairs, 143 F.3d at 1436.

## IV. CONCLUSION

We find no reversible error in the well-reasoned and thorough orders of the district court.  We **AFFIRM** the order of contempt and final order of disgorgement.

**AFFIRMED.**